**Carl E. MATHENA and Helen B. Mathena, Plaintiffs and Appellees,**

**v.**

**UNITED STATES of America, Appellant.**

**No. 25027.**

United States Court of Appeals, Ninth Circuit.

July 29, 1971.

Karl Schmeidler, Atty., Dept. of Justice (argued), Johnnie M. Walters, Asst. Atty. Gen., A. Jerry Busby, Tax Div., Washington, D. C., Richard K. Burke, U. S. Atty., Phoenix, Ariz., for appellant.

Julian F. Weltsch (argued), James P. Cunningham, of Cunningham, Tiffany,

Weltsch & Scott, P.A., Phoenix, Ariz., for appellees.

Before CHAMBERS and HUFSTEDLER, Circuit Judges, and TAYLOR, District Judge.

CHAMBERS, Circuit Judge:

The decision of the district court allowing a refund is affirmed.

Mathena, prior to July 1, 1963, was employed by Akron Savings & Loan Association (Akron), doing business in Akron, Ohio.[1] Closely allied with Akron was Bankers Guaranty Title & Trust Company (Bankers).[2]

An arrangement was made under which Mathena could "eat his cake and keep it, too." He drew his retirement benefits out of the retirement fund of Akron. He had been drawing a salary of $19,000 a year.

On July 1, 1963, he turned up with a new arrangement. He went on the payroll of Akron at a salary of $10,000 a year as a consultant—obviously an attempt at a "fee" setup. Also, simultaneously, he was newly hired at a price of $10,000 a year to work for Automated Business Services and Systems, Inc. (Automated), a "services" company of which he was the controlling stockholder. Automated had two customers: Akron and Bankers. A contract was signed between Akron and Automated, terminable on one year's notice, for "services." A monthly contract was drawn with Bankers, which was never signed, but the parties seem to have operated under it.

By December, 1963, Akron and Bankers wanted to get rid of Mathena.

No formal contract to terminate was ever drawn up. A price of $25,160 was agreed upon. Bankers paid Mathena $2,160 and took Mathena's controlling stock in Automated. Akron treated the transaction as a severance pay deal and paid Mathena $25,000.[3] Mathena treated the whole transaction as a sale of his stock in Automated and only as a capital gain on his stock.

The district court thought the parties' subjective intents were important and liked Mathena's version better. We arrive at the same result in a different way.

Our reasoning is this: At the time Mathena "sold out" he had no tenure with Akron. Akron only had to pay him for the current month to release him. This was done two weeks before the sale. Strictly, Mathena had no tenure with Automated, but he was assured a job with Automated as long as he had a controlling interest in the stock. And Automated had a right to work for a year for Akron before a termination would be effective.[4] Thus Mathena's stock in Mathena's hands had two elements of value: some market value and a lot of nuisance value. That was all that Mathena sold. So it was a stock sale.

We cannot rightly censure Akron and Bankers, because they are not before us. (If they were, they might have an opportunity to be heard.) But on our record, as between Akron and Mathena, Akron itself bought nothing for its $25,000. Under Ohio state law, Akron could not buy Automated stock. Bankers could. It paid $2,160 and got the

---

1. Mathena's wife is a party to the action only because a joint return was filed. She plays no active part in the events which form the basis for the refund. Shortly after Mathena parted company with Akron, the Mathenas moved to Arizona; therefore, they filed their refund suit in the District of Arizona.

2. Both Akron and Bankers were controlled by C. G. Herberich. He was president of Bankers and a "very active" director of Akron.

3. Akron's directors' meeting minutes use this figure. In fact, deductions for income and F.I.C.A. taxes were subtracted and Mathena received a check for $20,201.

4. Mathena "tendered his resignation" as the president and a director of Automated the day after he sold his stock. Herberich replaced him on the board of directors; Albright, president of Akron, replaced him as president.

stock. Having given up nothing directly to Akron, Mathena may treat the deal as a sale of stock, the only thing he directly gave up. Obviously, we have a couple of corporate hats askew.

We have no intention of repudiating our Murphy Logging Co. v. United States, 378 F.2d 222 (9th Cir. 1967); Starr's Estate v. C. I. R., 274 F.2d 294 (9th Cir. 1959); Robinson v. Elliot, 262 F.2d 383 (9th Cir. 1958); C. I. R. v. Wilshire Holding Corp., 244 F.2d 904 (9th Cir. 1967); or Oesterreich v. C. I. R., 226 F.2d 798 (9th Cir. 1955). There we permitted a recasting of the transactions to reflect reality; here we collect the pieces to discover reality.[5]

Decision affirmed as to the appellees' income taxes for the year 1964.

---

5. Baxter v. C.I.R., 433 F.2d 757 (9th Cir. 1970) and Rogers v. United States, 290 F.2d 501 (9th Cir. 1961) are cited by the United States. Both look to the reality of the situation, as we do here.