Kenneth C. Hoagland and Eathyl L. Hoagland v. Commissioner. Bob Vincent and Louise F. Vincent v. Commissioner.
Hoagland v. Commissioner
Docket Nos. 104-68, 116-68.
United States Tax Court
T.C. Memo 1971-310; 1971 Tax Ct. Memo LEXIS 21; 30 T.C.M. (CCH) 1326; T.C.M. (RIA) 71310; December 8, 1971, Filed *21 The petitioners received payments in settlement of a suit in which they alleged that a partnership existed between themselves and third parties with respect to certain land. In the settlement agreement, the payments were designated as a "finder's fee." Held: (1) Extrinsic evidence is admissible to determine whether the payments represented a finder's fee or payment for the petitioners' interests in the partnership; 1327 (2) A partnership existed with respect to the land; and (3) The payments are entitled to long-term capital gain treatment as the land held by the partnership was not held primarily for sale to customers in the ordinary course of business at the time of settlement. William E. Coombs, Mun. Ct. J., Rialto, Calif., and Ray O. Womack, for the petitioners. Allan D. Teplinsky, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies of $1,034.98 for 1962 and $7,883.59 for 1963 in the Federal income taxes of Kenneth C. and Eathyl L. Hoagland, and a deficiency of $7,785.97 for 1963 in the Federal income tax of Bob and Louise F. Vincent. The cases have been consolidated, and the sole issue for decision is whether *22 the petitioners are entitled to treat as a long-term capital gain certain payments which they received in settlement of a suit brought by them to establish their interests in certain land but which were designated as a "finder's fee" in the settlement agreement. Findings of Fact Some of the facts were stipulated, and those facts are so found. The petitioners, Kenneth C. Hoagland and Eathyl L. Hoagland, were husband and wife and maintained their residence in Rialto, California, at the time of filing their petition in this case. They filed their joint Federal income tax returns for 1962 and 1963 with the district director of internal revenue, Los Angeles, California. The petitioners, Bob Vincent and Louise F. Vincent, were husband and wife and maintained their residence in San Clemente, California, at the time of filing their petition in this case. They filed their joint Federal income tax return for 1963 with the district director of internal revenue, Los Angeles, California. Mr. Hoagland and Mr. Vincent are referred to as the petitioners. In March 1955, Michael Scarlotti, a real estate broker, brought to the petitioners' attention the possibility of purchasing a tract of land in Puente, *23 California, of approximately 240 acres. The land was reasonably priced at $1,500 an acre. Mr. Vincent showed the land to Henry H. Wheeler, Sr., and Henry H. Wheeler, Jr., with whom the petitioners had engaged in other real estate investments. In the following weeks, Mr. Vincent had several conferences with various people concerning the acquisition of the land. At some of these conferences, Mr. Wheeler, Sr., was present, and Mr. Wheeler, Jr., was present at one of them. Mr. Hoagland also iook part in the negotiations. The land was purchased on or about July 20, 1955, for a price of approximately $360,000, and Mr. Wheeler, Jr., took title in his name and that of his wife. During the purchase negotiations, the subject of a finder's fee for the petitioners was never discussed, and Mr. Scarlotti received a full brokerage commission. While Mr. Wheeler, Jr., held title to the land, the petitioners examined the possiblities of developing it. They drilled three wells on the land and found that there was not enough available water to develop a housing subdivision. The costs of drilling and an engineering survey were paid by the petitioners. Other expenses, such as property taxes and assessments, *24 were paid by Mr. Wheeler, Jr. Sometime after the results of the drilling for water were known, the petitioners became active in having the land rezoned for cemetery use. They spent many hours on the project and introduced Homer Saunders to Mr. Wheeler, Sr. In February 1958, Mr. Saunders and Mr. Wheeler, Jr., entered into an agreement under which Mr. Wheeler, Jr., agreed to pay Mr. Saunders a commission if Mr. Saunders obtained the necessary rezoning. The petitioners then worked with Mr. Saunders in attempting to obtain the needed zoning. The needed zoning was accomplished in December 1958, but was attacked by a quo warranto action in March 1959. There was never any discussion in regard to compensating the petitioners for their efforts in attempting to obtain the rezoning. On August 25, 1958, while negotiations for the rezoning were still in progress, Mr. Wheeler, Jr., and his wife entered into an agreement to sell the land to Julia Cook for $1,084,500. The sale was predicated upon the condition that the land could be used as a cemetery. In June 1959, as a result of the quo warranto action which threatened the revocation of the cemetery rezoning, Julia Cook commenced a breach of contract *25 suit against Mr. Wheeler, Jr., and filed a lis pendens against the property. In 1960, the suit was settled. The petitioners generally knew of the negotiations leading to 1328 the agreement of sale, the agreement, the contract suit, and the settlement. They neither took part nor intervened in any of these events, and the payment to settle the suit was made entirely by Mr. Wheeler, Jr. In view of the difficulties in developing the land or selling it as a cemetery, no further development of the land was contemplated. One portion was rented for grazing, and a small building on the land was rented as a cafe. The pasturage lease was executed by Mr. Wheeler, Jr., and his wife. The rents from both leases were collected by Mr. Vincent and turned over to Mr. Wheeler, Sr.; Mr. Wheeler, Sr., transmitted the pasturage rents to Mr. Wheeler, Jr. In 1961, Mr. Wheeler, Jr., commenced negotiations for sale of the land to Pickering Enterprises, Inc. The petitioners learned of these negotiations and made appointments with Mr. Wheeler, Sr., to discuss the proposed sale. Mr. Wheeler, Sr., never showed up for the appointments, and on December 11, 1961, Mr. Hoagland and a corporation wholly owned by the petitioners *26 filed a complaint for declaratory relief and to quiet title in the Superior Court. The defendants were Mr. Wheeler, Sr., Mr. Wheeler, Jr., various other unknown persons, and Mr. Vincent, who was out of the country when the complaint was filed. The complaint generally alleged that a partnership existed between the Wheelers and the petitioners, that the Puente land was owned by such partnership, and that the petitioners were entitled to share in any profits from the sale of the land. The Wheelers entered a general denial and counterclaimed for certain debts allegedly owed to them as a result of past partnership dealings with the petitioners. In connection with the suit, the petitioners filed a lis pendens against the land. As a result of arm's length negotiation between the parties through their representatives, a settlement of the lawsuit was reached on August 31, 1962. All claims arising out of the past complex business transactions between the Wheelers and the petitioners were to be discharged by the settlement. The petitioners agreed to release their lis pendens, to have Mr. Wheeler, Jr.'s share of the profits of two earlier partnerships paid to him, and to have one of their corporations *27 sell certain stock to Mr. Wheeler, Jr. Mr. Wheeler, Jr., agreed to hold the petitioners harmless on certain debts owed to his sister, to cancel debts owed to him, and to convey to the petitioners two 6-acre tracts of the Puente land. If such conveyances were not accomplished by specified dates, Mr. Wheeler, Jr., was to pay $60,000 to each of the petitioners. The settlement agreement stated that the conveyance of the land to the petitioners was "[in] recognition of their interest therein as a finder's fee." Before signing the agreements, the petitioners objected to having the conveyance to them designated a finder's fee, but they ultimately accepted the provision, when they were advised that provision was requested by Mr. Wheeler, Jr.'s counsel and that it would not make "much difference" to them. After the execution of the settlement agreement, the petitioners never made any attempt to modify the provision designating the conveyance to them as a finder's fee. In both December of 1962 and January of 1963, Mr. Wheeler, Jr., paid each of the petitioners $30,000. On February 8, 1963, the Superior Court granted the parties' joint request for dismissal of the lawsuit, and in 1963, subsequent *28 to the release of the lis pendens, Mr. Wheeler, Jr., sold 216 acres of the Puente land to Pickering Enterprises, Inc. No Federal partnership returns of income were ever filed with respect to the Puente land. Previous to the activities involving the Puente land, Mr. Hoagland and Mr. Vincent entered into several real estate development partnerships with Mr. Wheeler, Sr. In general, the partnerships were developed in the following manner: The petitioners located a tract of land and showed it to Mr. Wheeler, Sr. If he liked the land, it was purchased, and title was taken, at his discretion in his name, his son's name, his daughter's name (Florence Richardson), or the name of one of his corporations. During the period before development, while title was held in the name of a Wheeler or a Wheeler corporation, an engineering feasibility study was made to determine how many houses could be built on the land. During this period, the title owner paid the expenses connected with the land, such as assessments, and took the appropriate Federal income tax deductions. When the parties were ready to develop the land, the title was transferred to the petitioners or a corporation wholly owned by them *29 for construction and sale of the houses. To enable the petitioners or their corporation to secure financing for the project, no mortgage or other lien was placed on the transfer to the petitioners or their corporation. 1329 When the houses were sold, the profits were computed by subtracting the costs of constructing them and the expenses incurred by the Wheelers while they held the title to the property. Such profits were then divided, one-half to the petitioners and one-half to the Wheelers. Two tracts of land, acquired under the same type of partnership arrangement, were sold without development and the profits were shared in the same manner. At first, the partnership agreements were in writing. In 1953 and 1954, the petitioners and the Wheelers entered into two written partnerships known as Covina Park One and Two. In one of these partnerships, some of the land was held by Mr. Wheeler, Jr. Federal partnership returns of income were filed for the written partnerships. However, before 1955, the petitioners and Mr. Wheeler, Sr., entered into at least two oral partnerships for the development of real estate under substantially the same terms as the written partnerships. Subsequently, *30 the petitioners and Mr. Wheeler, Sr., entered into other similar oral partnerships. Federal partnership returns of income were not filed for the oral patnerships. In all, there were approximately 10 partnerships for the development of land and the construction and sale of houses thereon. In none of them were the petitioners paid a finder's fee for their activities. Mr. Vincent was, at all relevant times, both a licensed attorney and a licensed real estate broker, and Mr. Hoagland and Mr. Wheeler, Jr., had extensive backgrounds in real estate transactions. In their returns for 1962 and 1963, Mr. and Mrs. Hoagland treated each payment that they received pursuant to the settlement agreement as a long-term capital gain realized in the year received. In their return for 1962, Mr. and Mrs. Vincent treated both payments received by them as a long-term capital gain realized by them in that year. The respondent took the position that the payments constituted ordinary income when received. Opinion The respondent contends that the payments received by the petitioners pursuant to the settlement agreement are taxable as compensation because the agreement provided that they were paid as a "finder's *31 fee" and because extrinsic evidence is inadmissible to show that such payments were made for any other purpose. In the alternative, he contends that even if the extrinsic evidence is considered, it does not establish that a partnership existed between the Wheelers and the petitioners. Finally, he argues that if a partnership did exist, it held the Puente land primarily for sale to customers in the ordinary course of its business and that any gain resulting from such sale is ordinary income. We shall decide the case on the basis of such issues. In arguing that the terms of the settlement agreement are controlling as to the reason for making the payments, the respondent relies upon the decision of the Third Circuit in Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), rev'g 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), in which the court said at 775: a party can challenge the tax consequences of his agreement * * * only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * In J. Leonard Schmitz, 51 T.C. 306 (1968), *32 on appeal (C.A. 9, May 2, 1969), we respectfully declined to follow that decision. The respondent asserts that the decisions of the Ninth Circuit where this case arose indicate that such circuit would follow the Danielson decision and that under our decision in Jack E. Golsen, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), cert. denied - U.S. - (1971), we are thereby bound to follow the decisions of the Ninth Circuit. However, in Golsen, we held that we would follow the decisions of a circuit, regardless of our own views, when the circuit has squarely decided the issue. Clearly, the Ninth Circuit has not adopted the Danielson rule. Indeed, the decision of that circuit in Schulz v. Commissioner, 294 F. 2d 52 (C.A. 9, 1961), affg. 34 T.C. 235 (1960), has often been relied upon as authority for the "strong proof" rule. See Mathena v. United States, 446 F. 2d 560 (C.A. 9, 1971). Under these circumstances, we have not been presented any reason to reconsider our decision in Schmitz, and accordingly, we shall continue to follow our holding in that decision. We shall continue to allow the introduction of extrinsic evidence, and if a party can establish by strong proof that the *33 true agreement was other than that set forth in writing, we will determine the tax consequences of the transaction by reference to their true agreement. 1330 Having reached that conclusion, we must now decide whether the extrinsic evidence does establish that a partnership existed between the petitioners and the Wheelers to acquire and develop the Puente land. The existence of a partnership depends upon the intent of the parties. Commissioner v. Culbertson, 337 U.S. 733(1949); Commissioner v. Tower, 327 U.S. 280, 287 (1946); Hubert M. Luna, 42 T.C. 1067, 1077 (1964). The question is whether the parties intended to join together to conduct business and to share the profits or losses therefrom. Commissioner v. Tower, supra.Such intent is to be ascertained by a consideration of all the surrounding circumstances, including the conduct of the parties. Lucia Chase Ewing, 20 T.C. 216 (1953), affd. 213 F. 2d 438 (C.A. 2, 1954). Obviously, the petitioners and Mr. Wheeler, Jr., did not in 1961, and do not now, agree on what was their intention in 1955 when the Puente land was acquired, but, based upon an examination of their conduct, it seems reasonable to conclude that the Puente land *34 was acquired with the implied understanding that it was to be held in accordance with a partnership similar to that under which other land had been acquired and developed. Prior to the acquisition of the Puente land in 1955, the petitioners and the Wheelers had formed other partnerships to acquire and develop land, some of which had not been reduced to writing. When Mr. Vincent first showed the land to the Wheelers, he was acting according to the general pattern of previous partnerships. The fact that the petitioners undertook to drill the wells to determine whether there was sufficient water to develop the land indicates that they had an interest in its future development. They spent substantial time attempting to secure the rezoning of the property for use as a cemetery, and it was they who arranged for the services of Mr. Saunders. Consistent with their prior arrangements with Mr. Wheeler, Sr., they introduced Mr. Saunders to him, not to Mr. Wheeler, Jr., the holder of the legal title to the land. The petitioners collected the rents from the Puente land and delivered them to Mr. Wheeler, Sr., with whom they customarily dealt. When they became concerned about Mr. Wheeler, Jr.'s proposed *35 sale of the land, they attempted to contact Mr. Wheeler Sr. When they were convinced that it was necessary for them to bring action to protect their interests, their complaint was based on the theory that the Puente land was owned by a partnership of which they were members. They never claimed a finder's fee, and there was no discussion of compensating them for their services in arranging for the acquisition of the Puente land, in drilling on it for water, or for their rezoning efforts. These circumstances indicate that the petitioners did at all times believe that the Puente land was being held pursuant to a partnership in accordance with their other agreements with the Wheelers. Mr. Wheeler, Jr., testified that his father was not interested in the Puente land and that he acquired it in his own interest. Yet, Mr. Wheeler, Sr., participated in the negotiations which led to the acquisition of the land; the rents were paid to him; and Mr. Saunders was introduced to him. Moreover, in some of the other partnerships between the petitioners and the Wheelers, the title to the land was taken in the name of Mr. Wheeler, Jr. The fact that he paid the taxes and assessments on the land while he *36 held it was consistent with the other partnerships between the petitioners and the Wheelers. Likewise, the petitioners' failure to intervene in the proposed sale to Julia Cook and the failure to bear any of the expenses connected with that sale appears to be consistent with their prior arrangements in which the title holder bore all expenses of the land prior to its transfer to the petitioners for the construction and sale of the houses. Although Mr. Wheeler, Jr., stated that he would not have entered into an oral partnership because he did not enter into oral business transactions, he did admit that he had entered into an oral agreement of some type with the petitioners concerning the drilling for water on the Puente land. Mr. Wheeler, Jr., testified that a finder's fee is paid to a person who finds land for purchase or who finds a buyer for land and that the customary amount of the fee is approximately 5 percent. Obviously, the petitioners had nothing to do with arranging the sale of the land. If they were paid a finder's fee, it would be for finding the land for purchase. However, when it was acquired, its value was approximately $360,000, and 5 percent of that amount is $18,000, *37 considerably less than the $120,000 paid to the petitioners to settle their suit. Finally, we reach the issue of whether the Puente land was held by the partnership "primarily for sale to customers in the ordinary course of business" at the time of the settlement. If it was so held, it was not 1331 a capital asset by reason of section 1221(1) of the Internal Revenue Code of 1954, a1 and the payments for the sale of interests therein are taxable as ordinary income, not capital gain. See sec. 751. The respondent relies upon James E. Kesicki, 34 T.C. 675 (1960). In that case, the taxpayer was in the business of buying vacant property, erecting buildings thereon, and selling the improved property. Mr. Kesicki purchased a vacant lot and had the lot zoned for a medical building, but the purchaser refused to complete the purchase. Mr. Kesicki kept a sign on the land, "Will Build to Suit" until he sold the raw land the next year. This Court held that until the sale, Mr. Kesicki was still holding the property for sale in the ordinary course of his business. However, in the present case, it is clear that the intent of the partnership changed after it was discovered that the Puente land could *38 not be developed and that the property was then held for investment. The present case is similar to Malat v. Riddell, 383 U.S. 569 (1966), in which a joint venture purchased real estate with the purpose of developing it, and if that failed, keeping it as an investment. Due to zoning and financing difficulties, not all the property was developed, and the undeveloped property was eventually sold. The Supreme Court held that the word "primarily" in the phrase "primarily held for sale to customers in the ordinary course of business" meant "principally" or "of first importance"; the Court said at 572: The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * On remand, the district court found that the principal purpose for holding the undeveloped land was not for sale to customers in the ordinary course of business. 275 F. Supp. 358 (S.D. Calif. 1966). Similarly, in the present case, the *39 Puente land, after it became apparent that it could not be developed, was not held primarily for sale to customers in the ordinary course of the business of the partnership. See Maddux Construction Co., 54 T.C. 1278 (1970). The respondent also contended that if we found that the Puente land was not being held by the partnership primarily for sale to its customers in the ordinary course of its business, the partnership terminated and the payments were taxable as ordinary income. We need not decide whether the termination of the partnership would cause the payments to be taxable as ordinary income as we find that the partnership did not terminate. The respondent relied upon the regulations which state that a partnership terminates when no part of any business or venture to be carried on by it remains to be completed. Sec. 1.708-1(b) (1), Income Tax Regs. However, when the partnership realized that the Puente land could not be developed, the venture was not completed; it was still necessary for the partnership to make some disposition of the land, and the partnership continued to hold it for the most advantageous sale that could be arranged. See Ginsburg v. United States, 396 F. 2d 983 (Ct. Cl. 1968). *40 In conclusion, we have decided against him, each of the issues raised by the respondent, and accordingly, we hold that the petitioners are entitled to treat as a long-term capital gain the payments which they received under the settlement agreement. However, since some of the adjustments made by the respondent have not been disputed by the petitioners, Decisions will be entered under Rule 50. Footnotes
a1. All statutory references are to the Internal Revenue Code of 1954.↩