HARRY T. ELSE AND DONNA O. ELSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Else v. Commissioner
Docket No. 4738-79.
United States Tax Court
T.C. Memo 1984-36; 1984 Tax Ct. Memo LEXIS 639; 47 T.C.M. (CCH) 941; T.C.M. (RIA) 84036; January 18, 1984. *639 Petitioner-husband resigned his position as vice-president of a subsidiary corporation. He owned stock in the corporation's parent holding company. After lengthy negotiations, he transferred his stock to the parent and executed a general release in favor of both corporations. He received $42,000 from the parent and $32,334 from the subsidiary. Held: (1) Petitioner-husband received $74,334 for his stock in the parent, which is taxable as long-term capital gain. (2) This Court does not have jurisdiction to determine whether the payment from the subsidiary is subject to the Federal Insurance Contributions Act (FICA) tax imposed by section 3101, I.R.C. 1954. Michael R. Freed, for the petitioners. Carmen J. SantaMaria, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioners for 1976 in the amount of $10,966.96. After concessions by petitioners, [1] the issues for decision are: (1) Whether a $32,334 payment received by petitioner-husband from his former employer is taxable as a long-term capital gain or as ordinary income; and (2) Whether petitioners are entitled to a refund *640 or credit of Federal Insurance Contributions Act (FICA) taxes that were withheld from the $32,334 payment. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in the instant case was filed, petitioners Harry T. Else (hereinafter *641 sometimes referred to as "Else") and Donna O. Else, husband and wife, resided in Pittsburgh, Pennsylvania. From December 1, 1967, until on or about April 25, 1975, Else was employed by Quaker State Coca-Cola Bottling Company (hereinafter sometimes referred to as "Quaker State"). About September 1970, Else was promoted to be general manager of Quaker State's Pittsburgh operations. During much of the time from October 1, 1970, through April 25, 1975, Else was vice-president of Quaker State, as well as general manager of its Pittsburgh operations. On or about August 31, 1971, Else purchased from Abarta, Inc. (hereinafter sometimes referred to as "Abarta") 50 shares of Quaker State stock for $15,000. This was about 1 percent of the issued and outstanding shares of Quaker State. At this time, Abarta owned a majority of the shares of Quaker State. In August 1972, Else exchanged his 50 shares of Quaker State stock for 5,201 7/8 shares of Abarta stock. During 1973, Else received a 20-percent stock dividend of 1,040 3/8 shares of Abarta stock. Else then owned 6,242.25 shares of Abarta stock (hereinafter sometimes referred to as "the Abarta stock"). [2] The Abarta stock consisted of nonvoting *642 shares, which were subject to a right of first refusal in favor of Abarta. In 1972, John Soughan (hereinafter sometimes referred to as "Soughan") was hired by Quaker State as its vice-president in a position supervisory to that of Else. Soughan proceeded to take over most of Else's responsibilities. On or about April 25, 1975, Else resigned his position with Quaker State as a direct result of the pressure brought to bear against him by Quaker State's management. At this time, Else was being paid by Quaker State at an annual rate of $26,300. A letter to Else from Quaker State dated April 25, 1975, and signed by Soughan, provides, in pertinent part, as follows: Dear Mr. Else: This *643 will confirm our discussions regarding your resignation effective April 25, 1975. (1) Severance pay will be on a regular pay check basis through the end of the 2nd quarter, June 30, 1975. (2) You will be entitled to all earned vacation which is calculated as six weeks. Insurance coverages will coincide with the severance and vacation time which is to August 8, 1975. (3) You may purchase the 1974 Thunderbird at the book value of $3,300 after July 1, 1975. (4) The company will provide office space for the next quarter at a location of its choice. (5) Your Abarta stock will be re-purchased to provide substitute retirement protection. John Bitzer will prepare a program based on an exchange of notes. As an alternative, we will look at the purchase of an annuity or insurance policy in exchange for the shares. In the event that you take a position with a company competing directly with Abarta operations prior to August 8, 1975, we will consider the severance agreement violated and will terminate payments. On June 3, 1975, Else and John F. Bitzer, Jr. (hereinafter sometimes referred to as "Bitzer"), Abarta's president, met to discuss the matters referred to in Soughan's letter. *644 At this meeting, Else and Bitzer agreed that Else would continue on the payroll of Quaker State through the end of 1975. In addition, Else agreed to perform two consulting projects for Quaker State, for which he would receive $3,000 in 1975 and $3,000 in 1976. Else and Bitzer also discussed the sale to Abarta of the Abarta stock. Else asked that the Abarta stock be bought from him for $96,000. They tentatively agreed that Else would sell the Abarta stock to Abarta for $42,000. They also tentatively agreed that Else would enter into a consulting agreement, containing a covenant not to compete with Quaker State, for which Else would be paid $42,000 over a six-to-seven year period. Else and Bitzer also agreed that their respective attorneys would finalize the terms of the stock sale and the consulting agreement. The next day, Bitzer prepared a file memorandum of the meeting, as follows: Established first in meeting that: 1. Basic reasons for severance stand, no reason for reconsideration 2. Not proud of the way severance was handled 3. Willing to review terms of severance, including stock buy-in He agrees that there is no sense rehashing reasons, accepts apology for handling of *645 severance. Basic agreement reached on stock buy-in and severance: 1. $42K for stock 2. $42K in consulting/non compete over 6-7 years 3. $6K to complete major project with regard to advance selling Stock purchase may be for notes, against which HTE would borrow to invest in small business. Another alternative is trade annuity for stock.Further, life insurance continuation might be part of the package. Bitzer sent to Else a pair of draft agreements. One draft agreement provides that Else would sell the Abarta stock to Abarta for $42,000, to be paid on May 16, 1982, with interest payable quarterly (at a seven-percent annual rate) beginning January 2, 1976. The other draft agreement provides that Else would render consulting services to Quaker State from January 2, 1976, through December 31, 1982, and that he would be paid $6,000 each year for this seven-year period; it also provides that "7. In the event of the death of the Consultant [Else] at any time during the term hereof, the annual payments provided for in this agreement will be paid to the Consultant's widow or his estate." On or about August 19, 1975, Donald L. Very (hereinafter sometimes referred to as "Very"), Else's *646 attorney, sent the agreements to J. Evans Rose, Jr. (hereinafter sometimes referred to as "Rose"), Abarta's attorney, together with suggested changes. During the next few months, Very and Rose exchanged telephone calls and letters concerning the finalization of the stock sale and accompanying agreement. Else was not present during any of the negotiation sessions between Rose and Very. Neither of these draft agreements was executed by Else, Abarata, or Quaker State. On January 12, 1976, Else met with Very and Rose. At this meeting, Else endorsed the Abarta stock over to Abarta. Else executed a document at this meeting entitled "GENERAL RELEASE" (hereinafter sometimes referred to as "the release"), which provides as follows: KNOW ALL MEN BY THESE PRESENTS, that H. T. ELSE, of Pittsburgh, Pennsylvania, as well for and in consideration of the sum of ONE ($1.00) DOLLAR and other good and sufficient consideration, to him in hand paid by QUAKER STATE COCA-COLA BOTTLING COMPANY, of Pittsburgh, Pennsylvania, at and before the sealing and delivery hereof, the receipt whereof he does hereby acknowledge, has remised, released, and forever discharged, and acquitted, and by these presents, for *647 himself, his heirs, executors, administrators and assigns, does hereby remise, release, discharge and acquit QUAKER STATE COCA-COLA BOTTLING COMPANY, ABARTA, INC., and the successors and assigns of each of them, of and from all, and all manner of claims and demands, actions and causes of action arising out of any matter, event, occurrence, cause or thing from the beginning of the world to the date of this Agreement, except that QUAKER STATE COCA-COLA BOTTLING COMPANY is not released by H. T. ELSE from its obligation to pay him the sum of Three Thousand Dollars ($3,000.00) on April 1, 1976. IN WITNESS WHEREOF, H. T. ELSE has set his hand and seal this 12th day of January, 1976, with the intent to be legally bound hereby. The release was the only agreement executed by Else at this meeting. Else never executed a consulting or noncompetition contract with Quaker State or Abarta (apart from the two $3,000 consulting agreements discussed supra). Else received a certified check in the amount of $42,000 from Abarta.Else was also paid $32,334 [3] by Quaker State (hereinafter sometimes referred to as "the payment"), from which certain taxes were withheld. Else was given a cashier's check in *648 the amount of $24,467.03; attached to this check was a statement (hereinafter sometimes referred to as "the statement") which reads, in pertinent part, as follows: Gross Wages
$32,334.00
F.I.C.A.
895.05
FED. Withholding
6,315.24
Pgh. Occupational Tax
10.00
State Tax
646.68
$24,467.03
The final agreement reached between petitioner, Abarta, and their representatives concerning the stock sale, the consulting agreement, and the release was negotiated and agreed to as a single package. Quaker State paid Else his regular pay check from April 25, 1975, through December 31, 1975. Except for the two consulting projects which petitioner agreed to at the June 3, 1975, meeting with Bitzer, Else did not perform any services for Quaker State during this time. Else was paid $3,000 in 1975 and $3,000 in 1976 by Quaker State for these two consulting projects. Else did not receive any money from Quaker State during 1976, other than the payment, and the $3,000 which was paid for the second consulting project. Else was not *649 paid any wages during 1976 by any employer other than Quaker State.
Quaker State issued to Else a Form W-2 for the year 1976 reflecting amounts identical to those shown in the statement. The Form W-2 was attached by petitioners to their Federal income tax return for 1976. Abarta has interests in newspaper publishing, soft drink bottling, oil and gas drilling, and several other lesser ventures. More than 90 percent of Abarta's issued and outstanding stock (including all of its voting stock) is owned by three families. Abarta's stock was owned by a total of 15 to 20 individuals during 1975. The book value as of December 31, 1974, of one share of Abarta stock was $6.90. Abarta stock was not listed on any stock exchange during 1975. Abarta stock was not traded publicly or over the counter during 1975. During 1975, Abarta stock was tradedd on nine occasions: three transactions involved a member of one of the controlling families and the other six involved employees' purchases of stock. All nine transactions were made at the December 31, 1974, book value. During the few years before 1976, Abarta reached retirement agreements with two executives other than petitioner who owned stock *650 in Abarta. In each instance, the executive agreed to sell the stock back to Abarta and to enter into a consulting agreement or a noncompetition agreement. In each instance the executive received an amount equal to the book value of that executive's stock (which was allocated to the stock) and payments of roughly the same amount (which were allocated to the consulting or noncompetition agreement). The amount of the payment was determined by reference to the book value of the Abarta stock; it was not determined by reference to Else's salary. When Else left Quaker State, Quaker State did not have any established severance pay plan. Severance pay was determined on a case by case basis. On their joint 1976 Federal income tax return petitioners reported the sale of the Abarta stock. Petitioners showed a gross sales price of $74,334, which was arrived at by adding the payment from Quaker State ($32,334) to the $42,000 paid by Abarta. Petitioners showed a basis in the stock of $15,000 resulting in a long-term capital gain of $59,334. Petitioners also claimed a credit of $895 for the FICA taxes withheld from the payment. Petitioners did not report the amount shown on the Form W-2 as wages. *651 * * * Else sold the Abarta stock for a gross sales price of $74,334. OPINION I. Payment from Quaker State.
Petitioners contend that the payment to Else by Quaker State is part of a total of $74,334 realized from the sale of the Abarta stock, [4] within the meaning of section 1001, [5] *652 qualifying for the deduction for capital gains under section 1202. [6] Respondent contends that the payment was not part of the sales price of the Abarta stock, but was paid to Else solely as a result of the termination of his employment with Quaker State, and thus is taxable under section 61(a)(1). [7] *653 We agree with petitioners.
The issue presented is factual. Petitioners bear the burden of overcoming the presumption of correctness which attaches to respondent's factual determinations in the notice of deficiency. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Else offered to sell his stock for $96,000. Bitzer offered to pay Else $84,000 (one-half down and the other half in equal installments over seven years) in exchange for the stock and an agreement by Else to provide consulting services and to not compete for the next seven years. After negotiations, Abarta and Quaker State paid Else the amount that Bitzer had originally offered (except that the 7-year payout was commuted to its then current value) and, in exchange, Else transferred his stock and signed a general release.Thus, there was no agreement to perform consulting services and no agreement not to compete. No part of the consideration paid by Abarta and Quaker State appears to have been related to Else's rate of compensation. There is no evidence that Else at any time made any claim (other than with respect to the transfer of the Abarta *654 stock), or threatened to make any claim, which might fairly have said to have been compromised, or intended to have been referred to in the release.
Quaker State continued Else's salary from the date of the termination of his employment (April 25, 1975) to December 31, 1975, a period of about eight months. During this period, the only services Else performed for Quaker State were the consulting services for which he was separately compensated. Else had been employed by Quaker State for less than eight years. Especially in light of the eight months salary continuation in 1975, we conclude that petitioners have carried their burden of proving that the total $74,334 paid by Quaker State and Abrta to Else was paid in exchange for the Abarta stock. Respondent contends that petitioner must satisfy the standard of proof required by the "Danielson rule". [8] *656 In Commissioner v. Danielson,378 F.2d 771, 775 (CA3 1967), vacating and remanding 44 T.C. 549 (1965), the Court of Appeals stated: "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to later that *655 construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." [Emphasis supplied.] Respondent states that his construction of the release is that it was made for a consideration of $32,334, not the one dollar stated in the release. While respondent correctly defines the Danielson rule, he applies it only through a dubious sleight of hand. We cannot agree that the Danielson rule allows respondent to construe an agreement in a manner only hinted at by the words of the agreement and thereby impose on the taxpayer the heavy burden of proof required by the Danielson rule. The Danielson rule is not applicable to this case because petitioners are not attempting to vary the terms of the release as written. Rather, both sides are merely trying to construe the language of a general release that is so general that it is not inconsistent with either side's view of the substance of the transaction. The release is vague, both as to the amount paid and as to what the amount was paid for. The release protects Abarta, as well as Quaker State. We conclude that neither the Danielson rule nor the strong proof rule applies. See Throndson v. Commissioner,457 F.2d 1022, 1025 (CA9 1972), affg. Schmitz v. Commissioner,51 T.C. 306 (1968); Estate of Siegel v. Commissioner,74 T.C. 613, 621-622 (1980). Respondent contends that Quaker State paid $32,334 for the release, so that the payment was in consideration for Else's promise not to sue Quaker State or Abarta. Respondent acknowledges that it is difficult in this case to determine the nature of the potential suit Else might file against Quaker State or Abarta. Respondent focuses on the possibility of an age discrimination suit, and does not attempt to indicate what other causes of action Else might have had against Quaker State or Abarta. Although Bitzer *657 testified that the possibility of an age discrimination suit had been considered by him during the negotiations with Else, he also indicated that this was just one of many factors involved in his decision-making process. It is clear from his testimony that he did not give any great weight to the possibility of such a suit during his negotiations with Else. Bitzer did not suggest that Else or Very had raised the possibility of such a suit. None of the Communications between Else or Very (on the one hand) and Bitzer or Rose (on the other hand) that were presented to the Court in the instant case raises the possibility of such a suit. Bitzer failed to indicate any other possible causes of actions which he felt Abarta and Quaker State should have protected themselves from.Consequently, we conclude that respondent's contention on this point is not supported by the record, and that it does not comport with economic reality. Respondent argues that the payment was made because of Abarta's belief that Else had been treated shabbily, and its intention to ease the trauma of Else's severance from Quaker State. While this contention receives some support from Bitzer's testimony, we do not *658 find this argument persuasive. When Else left Quaker State, he had no right to severance pay under any established severance pay plan. In spite of this, Bitzer agreed to continue him on the payroll until the end of 1975. Thus, Else received more than $17,000 during 1975 from Quaker State which may fairly be described as severance pay. We would be strained to believe that Abarta's corporate compassion would compel it to pay Else an additional $32,334 in severance pay. When the negotiations began, Bitzer clearly had no intention of giving Else a large additional severance payment. Instead, he began to negotiate over the Abarta stock and a consulting agreement. However, Bitzer's own testimony makes it clear that the amount he was willing to pay Else pursuant to the consulting agreement was not based on the value to Abarta of Else's consulting services, but rather was related to the value of his Abarta stock. Bitzer indicated that in two other recent situations, Abarta had agreed to pay executives owning stock in Abarta roughly twice the book value of their stock, with one-half allocated in a written agreement to a stock purchase and one-half to a consulting agreement. Bitzer gave *659 no indication that executives who did not own stock received similar treatment. The pattern shown in these negotiations indicates to us that Abarta was primarily interested in recovering its stock and only secondarily interested in the consulting agreements. This pattern is exemplified by Else's case, where Abarta agreed to forego the consulting agreement completely. Respondent also argues that Else has ignored the fact that on January 12, 1976, two separate payments were made by two different entities in exchange for two distinct items of consideration. We cannot give much weight to the fact that two checks were used because Quaker State was a subsidiary of, and subject to the direction of, Abarta. Further, the record is clear that Bitzer and Rose negotiated the agreement with Else and Very on behalf of both companies. Else did not engage in two separate negotiations with two separate entities. See Mathena v. United States,446 F.2d 560 (CA9 1971). Finally, respondent's theory is inconsistent with the fact that the release refers to both abarta and Quaker State. Respondent finally argues that Else has failed to establish that the fair market value of the Abarta stock was at *660 least $74,334. Neither side presented any expert witnesses on this issue. Else instead presented his own valuation of the Abarta stock. Although we agree with respondent that Else's efforts in this regard were seriously flawed, the arguments made by the parties as to fair market value do not control the result here. Evidence as to the value of the Abarta stock is probative as to what Bitzer and Else might have agreed to as a selling price. However, what this Court must decide in the instant case is what amount the abarta stock was actually sold for, not what price Else would have been willing to sell it for, nor what price Bitzer would have been willing to pay, or even what the fair market value of the stock was. Better Beverages, Inc. v. United States,619 F.2d 424, 428 (CA5 1980), rehearing denied 625 F.2d 1160 (CA 5 1980). As discussed supra, we have concluded that Else sold the Abarta stock for $74,334. Thus, we need not make any finding as to the fair market value of the Abarta stock. We cannot rightly censure Abarta or Quaker State, for they are not before us. Clearly, they would have been interested in characterizing a part of the transaction as one which would entitle *661 one or both of the corporations to take a current deduction. Also, as petitioners suggest, the corporations may have had an interest in keeping the apparent price of the stock low, in order to establish baselines useful for estate and gift tax purposes. These concerns are possibilities suggested by the record, but we need not make determinations as to the motivations of the corporations. The bottom line of the negotiations is that Else gave up on the amount, and Abarta and Quaker State gave up on the characterization. The only thing the payment was for, was Else's stock in Abarta. See Mathena v. United States,supra.
We hold for petitioners on this issue. II. Credit for FICA Tax Wtihholding.
In their petition, petitioners dispute the disallowance by respondent of a $895 credit petitioners had claimed on their 1976 income tax return for excess Federal Insurance Contributions Act (FICA) tax withholding. Petitioners do not argue that they are entitled to a credit under section 31(b) for excess FICA tax withheld by more than one employer. In any event, we have found that Else did not receive any wages from any employer other than Quaker State during 1976. Consequently, petitioners *662 clearly do not qualify for any credit under section 31(b). Petitioners' claim as to the $895 credit is based on their contention that it was not proper for Quaker State to withhold the FICA tax imposed by section 3101 (which falls within subtitle C--Employment Taxes and Collection of Income Tax at Source) from the payment. Except through the application of section 31(b), this Court has no jurisdiction to decide whether FICA taxes have been erroneously withheld. Chatterji v. Commissioner,54 T.C. 1402 (1970); see Judd v. Commissioner,74 T.C. 651, 653 (1980). Consequently, we have no jurisdiction to decide whether petitioners are subject to the FICA tax with respect to the payment. [9]
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioners have conceded that adjustments made by respondent disallowing certain depreciation and distributorship business expenses totalling $17,323 are correct. In the notice of deficiency, respondent also determined that petitioners are subject to minimum tax as a result of the long-term capital gain they derived from the sale of Abarta, Inc., stock. Petitioners did not contest this determination in their petition, at trial, or on briefs. Consequently, we deem this issue to be conceded, though the correct amount of minimum tax may be higher than that shown in the notice of deficiency as a result of our resolution of the first issue for determination. In addition, respondent made a derivative adjustment to petitioners' itemized medical expense deduction. This adjustment also is to be modified to reflect our resolution of the first issue.↩
2. The parties have stipulated that in August 1972 Else exchanged his Quaker State stock for 6,242.25 shares of Abarta stock. However, Else's testimony, and respondent's proposed findings of fact, which were not objected to by petitioners, are consistent with the above findings of fact. The Court concludes that the parties have, in effect, agreed to modify their stipulation on this point. See Rule 91(e). Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. This amount was determined as the then present value of the right to receive $42,000 at the rate of $6,000 per year for the next seven years, discounted at an annual rate of seven percent.↩
4. The parties agree that Else's adjusted basis in the Abarta stock is $15,000 and that his gain on the sale of the Abarta stock qualifies for long-term capital gain treatment. ↩
5. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss.--The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized.--The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1954 as in effect for the year in issue. ↩
6. SEC. 1202. DEDUCTION FOR CAPITAL GAINS. In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income. * * * [The subsequent amendments of this provision (by section 1901(b)(33) (M) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1802; section 402(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2867; and section 104(a)(2)(A) of the Technical Corrections Act of 1979, Pub. L. 96-222, 94 Stat. 194, 214) do not affect the instant case.] ↩
7. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items;
8. In cases where one of the parties is attempting to establish a position at variance with the terms of his written agreement, this Court generally requires a showing by "strong proof" that the form of the written agreement does not reflect its substance. See Major v. Commissioner,76 T.C. 239, 247-249 (1981). However, we will apply the stricter "Danielson rule" in cases, such as this case, appealable to the Third Circuit, under the "Golsenrule" ( Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985↩ (CA10 1971).)
9. In a pretrial conference with counsel for the parties, this matter was discussed and respondent's counsel agreed to explore the matter of the overpayment of section 3101↩ tax if we were to hold for petitioners on the first issue in the instant case.